# JOHN W. CORMICAN v. ANCHOR CASUALTY COMPANY.

81 N. W. (2d) 782.

March 8, 1957—No. 36,931.

*Meagher, Geer, Markham & Anderson, David W. Nord, O. C. Adamson II, Lyman A. Brink,* and *Warren A. Saetre,* for appellant.
*Rosengren, Rufer & Blatti,* for respondent.

MATSON, JUSTICE.

Plaintiff appeals from a judgment for defendant insurer in an action to recover moneys paid out in the defense and settlement of a personal injury claim which arose, according to defendant insurer's contention, at a time when the automobile liability policy was not in force.

Plaintiff, on May 30, 1952, was involved in an automobile collision which indirectly gives rise to this action. A passenger in one automobile sued plaintiff and the other driver for damages for personal injuries. This damage suit was settled by the other driver's insurance company, and plaintiff paid one-half of the settlement by giving said insurance company his promissory note for $7,250. Plaintiff brings this action against his alleged insurer to recover said sum of $7,250 plus $460 for attorney's fees incurred.

The insurance policy upon which this action is brought was issued by the defendant insurer in February 1952, and by its terms the policy purports to give coverage for one year commencing March 4, 1952. Broadly stated, the question is whether this policy ever did go into effect, and if it did, whether it was effectively cancelled prior to plaintiff's accident on May 30, 1952.

In order to have a clear picture of the negotiations and circumstances surrounding the issuance of the above policy by the defendant through its agent, the State Bank of Warren, it is necessary to summarize the facts relating to the issuance to the plaintiff by defendant insurer, through its said agent, of two prior policies which expired on March 4, 1951, and March 4, 1952.

On November 5, 1950, plaintiff bought a Chevrolet from his son, Sammy Cormican, by assuming the unpaid balance of a conditional sales contract held by the State Bank of Warren. Plaintiff financed the balance due on the contract by executing a chattel mortgage to the bank. At the time of the transfer of the automobile, a policy of automobile liability and collision insurance issued by the defendant insurer, through said bank as its agent, was transferred from the son to the plaintiff. When this assigned policy expired on March 4, 1951, defendant issued through said agent, the bank, a renewal policy expiring on March 4, 1952. The bank extended credit to plaintiff for the payment of the premium on this renewal policy as is indicated by the following letter which was written to the plaintiff on May 10, 1951:

"Dear Sir:
"The insurance premium on your car amounting to $58.40 is past due since March 4th. Please send us a check for this amount at once so as to keep your insurance in force.

"Yours truly,
"R. J. Schirber (signed)
"President."

On May 29, 1951, almost three months after policy was issued, plaintiff paid the premium by his check dated May 26, 1951. When credit was thus extended for the preceding insurance policy, plaintiff was still indebted to the bank on the chattel mortgage given when he bought the Chevrolet.

Plaintiff testified that, when he paid the balance due on the chattel mortgage on November 6, 1951, he had the following conversation with R. J. Schirber, president of the bank, concerning the renewal of the automobile insurance:

"He [Mr. Schirber] asked me—he says, 'Your insurance runs out in the spring.' And he said, 'Do you want me to renew your insurance?' And I says, 'Yes.'

"Q. Was anything said at that time about payment?

"A. No. He says, 'You can drop in sometime when you come down and pay me.'"

When asked, Schirber testified that he did not recall whether plaintiff had asked for the renewal of the insurance.

The second *renewal* policy, the one involved herein, was executed in February 1952, and the policy was mailed to its agent, the State Bank of Warren. The bank charged the premium of $67.36 to plaintiff's insurance account and, retaining the policy in its possession, mailed to him, prior to March 4, an insurance certificate or identification card reading as follows:

"This Certifies that

"Anchor

Casualty Company

"Saint Paul, Minnesota

"Has Issued the Policy Specified Herein, Expiring on the Indicated Date to:

"John W. Cormican

"Argyle, Minnesota

"March 4, 1953

Policy Number AR 202264

"Agt. St. Bk. of Warren, Ins. Agcy."

Plaintiff, however, did not pay the premium, and on March 28, 1952, the bank sent him the following letter:

"Dear John:

"The insurance policy on your car expired on March 4th. We have renewed the policy for you and there is now due a premium of $67.36. If you want your insurance continued in force you will have to pay the premium by the first of April, other wise your policy *will be cancelled.*

"Please send us check for \$67.36 if you want your insurance continued in force." (Italics supplied.)

Although the letter was mailed, plaintiff denies receipt of it.

The bank, having had no further communication with plaintiff prior to April 2, 1952, on that date returned the policy to the defendant insurer's branch office for cancellation without any charge for earned premium (cancelled flat). No notice of cancellation was sent to the plaintiff after the letter of March 28, 1952, and there was no communication between the bank and the plaintiff until on or about June 2, when plaintiff tendered payment of the insurance premium, which was refused by the bank.

It is to be noted that plaintiff's tender of payment was made three days after the occurrence of the automobile collision on May 30, 1952. Defendant insurer refused to represent plaintiff in the personal injury action. Upon the advice of counsel, he joined in a personal injury settlement for \$14,500, half of which he paid by executing the promissory note hereinbefore described. This action to recover from defendant insurer \$7,250 plus \$460 for attorney's fees followed.

The trial court by its findings and order, as amplified and explained by its memorandum which was made a part thereof, found that the defendant insurer before the preexisting liability policy would expire on March 4, 1952, executed and forwarded to its agent, the State Bank of Warren, a renewal policy (No. AR 202264) embodying the same terms as the former policy, *with the exception that the liability coverage for personal injury had been increased* so as to provide \$25,000 for each person and \$50,000 for each accident. Coverage under the former policy was limited to \$10,000 and \$20,000. The bank placed the policy in its files, debited plaintiff's account with a premium charge of \$67.36, and then mailed to plaintiff the certificate of policy issuance or identification card hereinbefore set forth. The policy never was delivered to the plaintiff. On March 28, or 24 days after the renewal policy term began, the bank, not having been paid the premium, wrote and mailed plaintiff the so-called letter of cancellation.

On April 2, 1952, the bank cancelled the policy flat and wiped out the premium debit against the plantiff by giving him a corresponding credit. The trial court found there had been no extension of credit for the renewal policy premium and concluded that the policy had never gone into effect. In its memorandum the court indicated the basis of its decision as follows:

"* * * In this case the renewal policy was not requested by the plaintiff. Its issuance was therefore merely an offer on the part of the defendant to insure the plaintiff's automobile, and remained such until there was some affirmative act of acceptance on the part of the plaintiff. On receipt of the certificate the plaintiff did nothing. No contact was made with the defendant nor the bank agency. Plaintiff has wholly failed to show any act of acceptance on his part except his belief that credit was extended by reason of the fact that he was extended credit on his former policy."

■ Upon the record it was error for the trial court to reject plaintiff's testimony that he requested a renewal of the insurance for the ensuing year during a conversation with Mr. Schirber on November 6, 1951.

"* * * The rule is well established in this state that the court or jury cannot disregard the positive testimony of an unimpeached witness unless and until its improbability or inconsistency furnishes a reasonable ground for so doing, and this improbability or inconsistency must appear from the facts and circumstances disclosed by the record in the case. It cannot be arbitrarily disregarded by either court or jury for reasons resting wholly in their own minds and not based upon anything appearing on the trial." O'Leary v. Wangensteen, 175 Minn. 368, 370, 221 N. W. 430, 431.[1]

■ Plaintiff's testimony was not contradicted since Schirber did not deny the conversation but only said that he did not recall plaintiff's request for a renewal. Was plaintiff's credibility impeached by his own testimony that on June 2, 1952, when he tendered payment

[1]See, 20 Dunnell, Dig. (3 ed.) § 10344a; Ewer v. Coppe, 199 Minn. 78, 271 N. W. 101.

of the premium, he then saw the original renewal policy when in fact the policy had prior thereto been returned to defendant insurer's branch office? Aside from the fact that he could easily have mistaken some other paper or policy for the original policy, his erroneous testimony or observation relates to a matter collateral and immaterial to the issue of whether plaintiff had requested and thereby established an oral contract for insurance the preceding November. Credibility of a witness is not impeached merely by showing that on a subsequent occasion he was mistaken in his observation of a collateral fact which is immaterial and irrelevant to the controlling issue and which is so remote in time and circumstance as to have no reasonable bearing upon his veracity.[2] Plaintiff's testimony was not only uncontradicted and unimpeached but it was in fact corroborated by the unexplained increase in the coverage of the renewal policy since it is unreasonable to assume that the insurer would increase the coverage without having some prior authorization or request from the insured.

In view of plaintiff's uncontradicted and unimpeached testimony that he requested a renewal of the insurance for another year, the trial court erred in finding that the renewal policy had not been requested and in concluding that the policy was not in force according to its terms. In fact the conversation on November 6 established an oral contract to insure. It is the general rule, in the absence of statutory or charter provisions to the contrary, that an oral contract to renew existing liability insurance for an additional term is valid even though the act of executing and delivering the written renewal policy remains to be performed.[3] Where the parties by their oral agreement have clearly expressed an intent that a preexisting policy shall be renewed upon its expiration, the actual delivery of

---

[2]See, McCormick, Evidence, § 47; 20 Dunnell, Dig. (3 ed.) § 10348.

[3]See, Stewart v. St. Paul F. & M. Ins. Co. 171 Minn. 363, 214 N. W. 58; Schmidt v. Agricultural Ins. Co. 190 Minn. 585, 252 N. W. 671; Vance, Insurance (3 ed.) § 36; Prosser, *The Making of a Contract of Insurance in Minnesota*, 17 Minn. L. Rev. 567.

the renewal policy is not essential to the validity of the insurance contract.[4]

The subsequent conduct of the insurer and its agent, the bank, clearly shows that pursuant to the oral contract the renewal policy went into effect on March 4, 1952. Defendant insurer issued the policy, and although it was not delivered to plaintiff by the bank, the bank did mail plaintiff a pocket identification certificate or card which not only certified to the issuance of a policy but also carried on its reverse side a blanket authorization of the insurer for the furnishing to plaintiff of necessary bail and release of attachment bonds in case of traffic mishap or infraction of traffic regulations. The card bore the further legend: "CARRY THIS CARD WITH YOU." The reasonable import of the card was that the insurance went into effect as of March 4, 1952, and that the card should be carried by the insured as proof of his financial responsibility in operating a motor vehicle. In further corroboration of the existence of an insurance contract is the letter threatening cancellation if the premium was not paid by April 1st. The threat of cancellation carried with it the necessary implication that the contract was then in force. It is absurd to give notice of the cancellation of a nonexistent contract. The circumstances as a whole unmistakably lead to the conclusion that the renewal policy went into effect according to its terms and that the bank had extended credit for the premium.

Our view of the validity of the notice threatening cancellation makes it unnecessary to determine if the actual deposit of a notice in the mails is sufficient proof of notice where the insured denies receiving the same. For the purpose of this opinion, we shall assume that plaintiff received the notice.[5]

Although a notice of cancellation of an existing liability policy for failure to pay the premium need not be expressed in any particular form or language, it must, in explicit, unconditional, and unequivocal language, state that the policy is, or without further notice will stand, cancelled as of a certain day. A notice which

[4]Vance, Insurance (3 ed.) § 42.

[5]See, Schmidt v. Agricultural Ins. Co. 190 Minn. 585, 252 N. W. 671; Liverpool & London & Globe Ins. Co. v. Harding (8 Cir.) 201 F. 515, 517.

merely expresses a desire, threat, or expectation of cancellation, or which in any manner is ambiguous or evasive and therefore falls short of announcing an actual and unqualified cancellation as of a definite time if the premium is then unpaid, is invalid and does not terminate the policy or the liability of the insurer thereunder. This is the general rule.[6]

In the instant case the so-called letter of cancellation did not in explicit and unequivocal terms announce, in effect or otherwise, that the policy would, without further notice, stand cancelled as of April 1st if the premium was not paid on or before that day. It simply said that if the insured did not pay the premium by April 1st *"your policy will be cancelled."* (Italics supplied.) It did not say that the policy would stand cancelled as of April 1st. It merely announced that, if premium were not paid on that day, the policy would be cancelled without expressly saying when the cancellation would take effect or whether further notice thereof might be expected. The letter, especially in view of the generous credit extended to the plaintiff in the payment of the premium for the prior year, could reasonably be construed by the plaintiff as a dunning letter which only threatened cancellation but did not actually cancel the policy.

We hold therefore that the policy remained in effect after April 1st and was still in full force when plaintiff, subsequent to the happening of the automobile collision, made a tender of the premium.

The judgment of the trial court is reversed.

Reversed.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.

---

[6]John R. Davis Lbr. Co. v. Hartford Fire Ins. Co. 95 Wis. 226, 70 N. W. 84, 37 L. R. A. 131; Malin v. Netherlands Ins. Co. 203 Mo. App. 153, 219 S. W. 143; Davidson v. German Ins. Co. 74 N. J. L. 487, 65 A. 996, 13 L.R.A.(N.S.) 884, 12 Ann. Cas. 1065; American Glove Co. v. Pennsylvania Fire Ins. Co. 15 Cal. App. 77, 113 P. 688; Ralston v. Royal Ins. Co. 79 Wash. 557, 140 P. 552; Wisconsin Natural Gas Co. v. Employers Mutual Lia. Ins. Co. 263 Wis. 633, 58 N. W. (2d) 424; Appleman, Automobile Liability Ins. p. 468; 3 Richards, Insurance (5 ed.) § 414.